

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-23-2009

# USA v. Greenstein

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-3652

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"USA v. Greenstein" (2009). *2009 Decisions*. Paper 1492.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1492

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 07-3652

UNITED STATES OF AMERICA

v.

IAN GREENSTEIN,
aka/ John Dinunzio

Ian Greenstein,
Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Criminal No. 06-cr-0011-3
(Honorable James T. Giles)

Argued November 17, 2008

Before:  SCIRICA, *Chief Judge*, FUENTES and HARDIMAN, *Circuit Judges*.

(Filed April 23, 2009)

SARAH S. GANNETT, ESQUIRE (ARGUED)
Defender Association of Philadelphia
Federal Court Division
The Curtis Center, Suite 540 West
601 Walnut Street
Philadelphia, Pennsylvania 19106
        Attorney for Appellant

WILLIAM L. INDEN, ESQUIRE (ARGUED)
ROBERT A. ZAUZMER, ESQUIRE

Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, Pennsylvania 19106
      Attorneys for Appellee

---

## OPINION OF THE COURT

---

SCIRICA, *Chief Judge*.

### I.

Ian Greenstein was sentenced to a term of fifteen years imprisonment for armed robbery.[1]  Greenstein challenges both his conviction and sentence on appeal.  In challenging his conviction, Greenstein contends the District Court abused its discretion (1) in denying his motion to suppress certain pretrial identifications, and (2) in failing to grant a mistrial because of prejudicial statements made by the prosecution during trial. With regard to his sentence, Greenstein argues the District Court's application of a two-point offense level increase for physical restraint was erroneous.[2]

### II.

At approximately 11 p.m. on February 11, 2005, two gunmen entered the Casa Bella pizza shop at 2625 East Tioga Street, Philadelphia, shortly before closing.  The

---

[1]Greenstein was found guilty of interference with interstate commerce by robbery in violation of 18 U.S.C. § 1951(a), using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A), and aiding and abetting in both under 18 U.S.C. § 2.

[2]We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

larger man, later identified as co-defendant Allen French, wore black gloves and a large black leather jacket over a white hooded sweatshirt. He brandished a semi-automatic gun and had a grey t-shirt tied around his head to conceal his face. The smaller man, later identified as co-defendant Ian Greenstein, wore red gloves, a black skull cap, dark blue pants, and a long white t-shirt underneath a green jacket. He brandished a revolver and had a green t-shirt tied around his head to conceal his face. Both men ordered everyone in the store to the ground. The larger gunman went behind the front counter and took money directly from the owner of the store, Theocharis Zisios, and from the store's cash register, putting it into a canvas bag also stolen from the store. The smaller gunman retrieved store employee Sherrie Wright from the back of the store, then forced her, the store's driver, and a customer to sit beneath the counter. He took money from the driver and demanded that the customer hand over his ring.

The two gunmen then herded the six people inside the store into the back, ordering everyone into the walk-in freezer. They went to the back of the store, but ran out the back door instead of going into the freezer. The gunmen fled out the front door. The entire incident was captured on videotape by four separate security cameras set up throughout the store.

Once the victims were outside the store, they fled down an alley and out to a connecting street. From there, they saw a gray, four-door sedan drive slowly, without its headlights, down the street adjacent to the pizza shop with three people inside, two of

3

whom appeared to have something covering their heads. The victims, including Zisios and Wright, were unable to tell who was driving the car.

Philadelphia police officers responded to the scene of the robbery within minutes of the gunmen leaving. Some of the officers watched the videotape in order to be able to broadcast descriptions of the robbers, and other officers began canvassing the surrounding area. Within about ten minutes of the robbery, Philadelphia police officers responded to a call of prowlers in the backyard of a house on the 3600 block of Livingston Street, only a few blocks away from the pizza shop.

Philadelphia Police Officer Michael Walsh, who had seen the videotape, went to the location of the prowler call and, after hearing the rattling of the chain link fence and voices, saw three men, later identified as John Zgrzepski, Ian Greenstein, and Allen French, huddled together in the backyard. He immediately recognized two of them as matching the descriptions of the gunmen from the video. He also saw that those same two men had guns in their hands. Officer Walsh announced himself as a police officer, and the three men, including Zgrzepski, immediately fled in the same general direction.

Police officers caught Zgrzepski between Almond and Mercer Streets, within about a block of where Officer Walsh first had seen Zgrzepski huddling with his co-defendants on the 3600 block of Livingston Street. Police recovered $140 from his person. He was wearing a black jacket and a Pittsburgh Steelers jersey, which did not match what either of the gunmen in the video appeared to be wearing. Shortly after he

4

was caught, Zgrzepski repeatedly stated to Casa Bella employee Sherrie Wright, who had been driven out to see if she could make an identification, "I wasn't in your store."

Police officers caught Allen French within about a block of first encountering him. French was wearing a white hooded sweatshirt that matched the one worn by the larger gunman in the video. While being chased, French discarded a knotted gray t-shirt and a pair of black gloves that also matched items worn by the larger gunman. The police recovered $204 and a "Circus Man" ice cream receipt showing a delivery to Casa Bella on February 11, 2005, from French's pocket. The receipt was identified by Mr. Zisios as having been taken from the cash register during the robbery.

Officer Walsh chased Ian Greenstein, following him for well over a block, hopping several fences in the backyards behind the houses between Mercer and Thompson Streets as they ran. Officer Walsh got as close as 10 to 15 feet from Greenstein, and could see that he was wearing clothes that matched those of the smaller gunman in the video, i.e., dark blue pants and a long white t-shirt under a green jacket. Officer Walsh also was able to see Greenstein's face clearly on several occasions when Greenstein looked back. As he was closing in, Officer Walsh got caught on a fence and Greenstein escaped. Officer Walsh combed the area, and close to where he last saw Greenstein, he recovered a black skull cap, a pair of red gloves, and a green t-shirt. These items all matched what the smaller gunman in the video was wearing.

Following his escape from Officer Walsh, Greenstein knocked at the front door of the home of Tracy Zgrzepski, the sister of Zgrzepski and an employee of Casa Bella, who

5

also lived nearby.  Ms. Zgrzepski knew Greenstein through her brother, Zgrzepski. She had known him for five to seven months, and she had seen him at least 50 times during that period, including at least 10 times when he went to lunch with Zgrzepski at Casa Bella.  Greenstein also had been to Ms. Zgrzepski's house on prior occasions, both for social visits and looking for Zgrzepski.  Ms. Zgrzepski was not working at Casa Bella on the night of the robbery.  Nonetheless, by the time of Greenstein's visit, she was aware of the robbery, already had watched the videotape, and knew that her brother had been arrested for the robbery earlier in the night.  She immediately recognized Greenstein as one of the robbers in the video, and she did not let him inside.  Greenstein ran away.  Ms. Zgrzepski told the police about her encounter with Greenstein, and that she recognized him as being one of the gunmen in the video.

During the night of February 11, 2005, and the next morning, the police recovered several additional pieces of evidence from Livingston Street, in the area near where Officer Walsh first surprised the huddled defendants, including the canvas bag taken from Casa Bella containing $751.  The police also recovered two handguns:  a loaded revolver that was identified by Sherrie Wright as having been used by the gunman who forced her to sit under the counter, and a loaded 40 caliber semiautomatic pistol that was identified by Mr. Zisios as having been used by the gunman who took money from him, and forced him to empty the register.

In addition, parked nearby on the 3600 block of Mercer Street, the police found a 1990 four-door Honda Accord that previously had been reported stolen, and that was

6

identified as the getaway car that had driven past the pizza shop with three people inside following the robbery.  The location of this getaway car was not only close to where Officer Walsh had surprised Zgrzepski and his co-defendants, but it also was close to where the police had captured the fleeing Zgrzepski.  There was loose change scattered on the floor of the car, and from the back seat, the police recovered a black leather jacket that matched the jacket worn by the larger gunman in the video of the robbery.  Mr. Zisios also identified the jacket as having been worn by one of the gunmen.

## III.

Greenstein contends that certain pre-trial identifications were unnecessarily suggestive and unreliable, and should have been suppressed.[3]  Greenstein complains of two separate identifications: the first identification made by Officer Michael Walsh upon inadvertently viewing a single photograph while passing by the desk of Detective Ron Aitken.[4]  The second identification, also made by Officer Walsh, occurred when Walsh

---

[3]We review the District Court's decision to admit evidence of pre-trial identifications under an abuse of discretion standard. *United States v. Emanuele*, 51 F.3d 1123, 1127 (3d Cir. 1995).  We review the District Court's order "for clear error as to the underlying facts, but exercise plenary review as to its legality in the light of the court's properly found facts." *United States v. Inigo*, 925 F.2d 641, 656 (3d Cir. 1991).

[4]On the night of February 11, 2005, Officer Walsh had recently returned to the police station after failing to arrest a robbery suspect who had evaded capture during a foot pursuit.  After completing paperwork related to the robbery investigation, Walsh approached Detective Aitken's desk to deliver the paperwork.  Walsh noticed a photograph lying on Aitken's desk, and immediately recognized the individual in the photograph as the man he had been chasing earlier that night.  Walsh so informed Detective Aitken, and Aitken informed Walsh that the man in the photograph was Ian

(continued...)

7

saw Greenstein in a police cell-room three days after the robbery while Greenstein was being processed for an unrelated case.[5]

A pre-trial identification procedure violates the defendant's constitutional right to due process when that procedure is "both (1) unnecessarily suggestive and (2) creates a substantial risk of misidentification." *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006) (citing *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977)). The first element "contains two component parts: 'that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures.'" *United States v. Stevens*, 935 F.2d 1380 (3d Cir. 1991) (quoting 1 W. LaFave & J. Israel, Criminal Procedure § 7.4(b) (1984)).

Considering the totality of the circumstances, Officer Walsh's pre-trial identifications were not the result of unnecessarily suggestive procedures. In both instances, Walsh recognized Greenstein by coincidence, not as part of a formal identification procedure—nor one that was unnecessarily suggestive. Unlike the suggestive photo identification in *Brathwaite*, where a single photograph of the defendant was delivered to an officer for the specific purpose of making an identification, no one

---

[4](...continued)
Greenstein.

[5]On February 14, 2005, Officer Walsh was working in a police cell-room when Greenstein was brought in on unrelated weapons violation. Walsh immediately recognized Greenstein as the man he had chased the night of the robbery. Walsh informed Detective Henry Glenn, and Detective Glenn then interviewed Walsh.

8

suggested Walsh examine the photograph for the purpose of making an identification. Rather, Walsh simply noticed the photograph on Detective Aitken's desk. The cell-room identification was similarly unrelated to any formal identification procedure. By chance, Walsh saw Greenstein in the cell room and recognized him as a fleeing suspect from a robbery that occurred three days earlier. No one requested Walsh make an identification in the cell room, nor did anyone suggest to Walsh that the man he saw in the cell room (later identified as Greenstein) was involved in the robbery—all conversations between Walsh and Detective Glenn regarding the identification and the robbery occurred after Walsh had already recognized Greenstein.

Because we find neither the photo nor the cell-room identification was unnecessarily suggestive, we need not reach the second prong of the *Brathwaite* inquiry. *Brownlee*, 454 F.3d at 137 ("An identification procedure that is *both* (1) unnecessarily suggestive and (2) creates a substantial risk of misidentification violates due process." (emphasis added)). Accordingly, there was no constitutional violation, and the District Court did not err in refusing to grant Greenstein's motion to suppress.

IV.

Greenstein's second contention is that the District Court erred in failing to grant his two separate motions for a mistrial.[6] The first motion was made during trial after the prosecutor used the term "police photo" when referring to the photograph from which Officer Walsh made his first identification.[7] Greenstein suggests the prosecutor's reference to a "police photo" was prejudicial because it suggested to the jury that he had been in police custody sometime prior to the commission of this robbery. Greenstein requested a mistrial immediately after the prosecutor's statement, and the District Court denied his request. The second motion, also made during trial, occurred when Detective Glenn testified the reason Greenstein was in the cell room when Walsh made his second identification was because he had been arrested for an unrelated "weapons violation."[8]

---

[6]We review the District Court's decision to deny the motion for a mistrial under an abuse of discretion standard. *United States v. Hoffecker*, 530 F.3d 137, 193 (3d Cir. 2008).

[7]The following exchange took place during Officer Walsh's direct examination:

> Q: And the statement says, later that night, that you identified him, the same male, from a police photo, right?
> A: That's correct.
> Q: And it's referring to Ian Greenstein?
> A: That's correct.

App. 485-86.

[8]When asked to explain his involvement in the case, Detective Glenn gave the following testimony:

> There was a robbery of Casa Bella Pizza. There was [sic] three males

(continued...)

10

Greenstein argues that Detective Glenn's reference to his involvement in an unrelated "weapons violation" suggested that he had both a criminal propensity and a tendency to carry weapons, thereby creating improper prejudice in the minds of the jurors. Greenstein's request for a mistrial based on this statement was rejected by the District Court during trial.

Even when improper remarks are made during trial, a mistrial is not warranted when those remarks are harmless. *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (citing *United States v. Hasting*, 461 U.S. 499, 506, 508-09 (1983)). Such remarks are harmless when we "possess a 'sure conviction that [they] did not prejudice the defendant.'" *Id.* (quoting *United States v. Jannotti*, 729 F.2d 213, 219-20 (3d Cir. 1984)). We consider three factors when determining whether the defendant was prejudiced: "(1) whether [the witness's] remarks were pronounced and persistent, creating a likelihood they would mislead and prejudice the jury; (2) the strength of the other evidence; and (3) curative action taken by the district court." *United States v. Lore*, 430 F.3d 190, 207 (3d Cir. 2005).

---

[8](...continued)
> involved in the robbery. Two males were apprehended the night of the robbery, one male had—was chased by a plainclothes police officer, who we lost in the area. And that male was identified. Detective Ron Aitken had submitted a [sic] affidavit to the District Attorney's Office for charges, and in the interim, the male was arrested for a weapons violation at Twenty-fourth District.

App. 577.

11

Neither the remark made by the prosecutor nor that made by Detective Glenn warranted a mistrial in this case. The prosecutor's single, inadvertent reference to a "police photo" was insignificant in relation to the entirety of Greeinstein's trial. The defense never requested a curative instruction, nor was one given. After considering the evidence offered against Greenstein during trial, we are confident the prosecutor's comment was harmless and did not affect the jury's verdict.[9] Detective Glenn's remark about Greenstein's "weapons violation" was similarly harmless. This single statement over the course of his entire testimony cannot be considered "pronounced and persistent." *Lore*, 430 F.3d at 207. It was only one remark made for the sole purpose of explaining the circumstances under which Walsh made the cell-room identification; Glenn did not describe the circumstances of the arrest or the details of the crime. Furthermore, the District Court immediately offered a curative instruction upon defense's objection at trial. The court instructed the jury as follows:

> The jury will disregard the testimony entirely of this officer, please. Thank you. . . . Jurors, you're obligated to remember that what is evidence, is evidence, and what is not, is not. And what I've told you that you've heard from this witness thus far, in its entirety, is not evidence.

App. 577, 580. This statement is sufficiently curative to remedy any slight prejudice which may have resulted from Detective Glenn's statement. After considering the

---

[9]That counsel for the defendants repeatedly made reference to the phrase "police photo," App. 510, 559, 595, and specifically requested to have Detective Glenn's typed interview report—which included the words "police photo"—given to the jury at the close of trial, App. 915, further undermines Greenstein's argument on this issue.

evidence establishing Greenstein's participation in the robbery, we do not believe Detective Glenn's single remark was capable of misleading and prejudicing the jury.

Because neither the prosecutor's reference to a "police photo" nor Detective Glenn's mention of a "weapons violation" are so prejudicial as to warrant a mistrial, we conclude the District Court did not err in rejecting Greenstein's motions on these issues.

V.

Greenstein's final contention is that the District Court erred in imposing a sentencing enhancement for " physical restraint."[10]  Section 2B3.1(b)(4)(B) of the Sentencing Guidelines allows for a two-point offense level enhancement when robbery victims are "physically restrained to facilitate commission of the offense or to facilitate escape." U.S.S.G. § 2B3.1(b)(4)(B).  As this court has previously recognized, "[n]o actual touching is required to effect physical restraint" because the force required to achieve such restraint is "'not limited to physical force, but may also encompass the operation of circumstances that permit no alternative to compliance.'" *United States v. Copenhaver*, 185 F.3d 178, 182 (3d Cir. 1999) (quoting *United States v. Doubet*, 969 F.2d 341, 347 (7th Cir. 1992)).  In *Copenhaver*, this court held a defendant had "physically restrained" a victim by forcing him at gunpoint to move from one room to another and then commanded that he huddle inside a fireplace. *Id.* at 183.

_____

[10]We exercise plenary review of the District Court's interpretation of the Guidelines and review factual findings for clear error. *United States v. Grier*, 475 F.3d 556, 570 (3d Cir. 2007) (en banc).

13

Greenstein's actions are sufficiently similar to those in *Copenhaver* to establish physical restraint. While directing the barrel of his handgun menacingly towards them, Greenstein commanded his victims to sit on the floor and cower under a counter top. He then herded six individuals into a back room of the restaurant where he directed them to enter a large, walk-in freezer. Greenstein's threatening conduct left his victims with no alternative to compliance: he used the threat of physical force to restrict their freedom of movement, and confined them to specific areas within the restaurant. These actions amounted to more than "merely order[ing] [his victims] to stand still, kneel or lie down." *Id*. at 182. The fact that his victims eventually escaped is immaterial because "[i]t is the perpetrator's act of enclosing or confining the victim in a space or with a barrier, actual or threatened, that constitutes the action meriting enhancement." *Id.* at 182. Accordingly, Greenstein's conduct is sufficient to support the District Court's determination that the victims in this case were "physically restrained."

Finding no error, we will affirm the judgment of conviction and sentence.